# McGuire Gardner P.L.L.C.
Pernell W. McGuire  (SBN 015909)
320 N. Leroux
Flagstaff, AZ  86001
Telephone: (928) 779-1173
Facsimile: (928) 779-1175
pmcguire@mcguiregardner.com
Attorneys for Debtors

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE | **Case No.  4:09-bk-07333-JMM** |
| CHARLES AND CHRISTA CROWELL | Chapter 11 |
| Debtor | **DISCLOSURE STATEMENT** |

I.         INTRODUCTION TO DISCLOSURE STATEMENT

　　　1.1    Purpose of This Disclosure Statement.

　　　This Disclosure Statement has been approved by order of the Bankruptcy Court, dated _____ as containing information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the holders of claims against or interests in the debtor to make an informed judgment about the Debtors' Plan.  The Court's approval of this Disclosure Statement, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.  The purpose of this Disclosure Statement is to provide the holders of claims against the debtors with

1

adequate information about the debtors and the Plan to make an informed judgment about the merits of approving the Plan.

    1.2    <u>The Debtors' Plan</u>.

**THE DEBTORS' PLAN ACCOMPANIES THIS DISCLOSURE STATEMENT AS EXHIBIT A. THE READER IS URGED TO REVIEW THE DEBTORS' PLAN CAREFULLY IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT. IF THERE IS ANY CONFLICT BETWEEN THE PROVISIONS OF THIS DISCLOSURE STATEMENT AND THOSE OF THE DEBTORS' PLAN, THE PROVISIONS OF THE PLAN SHALL CONTROL.**

    1.3    <u>The Voting Process and Deadline</u>.

    A ballot accompanies this Disclosure Statement for use in voting on the Debtors' Plan. **To vote to accept or to reject the Plan, creditors and interest holders of the Debtor in any of the impaired classes should indicate their acceptance or rejection of the Plan and otherwise complete the Ballot which pertains to the Plan.** See the "Summary of Plan" contained herein and the Classification and Treatment of Claims and Interests" contained in the copy of the Plan attached hereto to determine whether you are a member of an impaired class. **Any creditor or equity holder holding claims in more than one impaired class must file separate Ballots for each such class.** Additional Ballots may be obtained by written request to the Debtors' lawyer, Pernell McGuire of McGuire Gardner, PLLC, 320 N. Leroux, Flagstaff, AZ 86001. (928) 779-1173..

You are urged to fill in, date, sign and promptly process your Ballot or Ballots.

**Please be sure to properly complete the form and to legibly identify the name of the claimant or interest holder.**  The holders of claims and interests may vote on the Plan by filling out and filing the accompanying Ballot for Accepting or Rejecting the Debtors' Plan with:

> Clerk of the U.S. Bankruptcy Court
> 230 N. First Ave, Suite 101
> Phoenix, AZ 85003

with a copy mailed to:

> McGuire Gardner, P.L.L.C.
> Attn: Pernell McGuire
> 320 N. Leroux
> Flagstaff, AZ 86001

**SIGNED AND COMPLETED BALLOTS MUST BE RECEIVED AND FILED, NOT MERELY MAILED, ON OR BEFORE 4:00 P.M. ON _____**

**_____** SINCE MAIL DELAYS MAY OCCUR, IT IS IMPORTANT THAT THE BALLOT OR BALLOTS BE MAILED OR DELIVERED WELL IN ADVANCE OF THE DATE SPECIFIED.  ANY BALLOTS RECEIVED OR FILED AFTER THAT DATE MAY BE EXCLUDED FROM THE CALCULATION TO DETERMINE WHETHER THE CREDITORS AND INTEREST HOLDERS OF A PARTICULAR CLASS HAVE VOTED TO ACCEPT OR TO REJECT THE DEBTORS' PLAN.

1.4     The Importance of Your Vote

As a creditor or interest holder your vote is important.  The Plan can be confirmed by the Court if it is accepted by the holders of *two-thirds in amount* and more than

*one-half in number* of claims in each impaired class of claims voting on the Plan, and if it is accepted by the holders of two-thirds in amount of interests in each impaired class of equity interests voting on the Plan.  In the event the requisite acceptances are not obtained, the Court may nevertheless confirm the Plan if the Court finds that it accords fair and equitable treatment to the class or classes rejecting it.

      1.5     The Confirmation Process

After the votes are tallied, the Court will hold a hearing on the confirmation of the Plan and may enter a Confirmation Order if it finds that the requirements for confirmation have been met.

If the required acceptance of one or more impaired classes of claims or interests is not obtained, § 1129(b)(1) of the Bankruptcy Code nevertheless permits the Bankruptcy Court to confirm the Plan upon request of the Debtor, if the Court finds that the Plan does not discriminate unfairly against and accords fair and equitable treatment to the impaired class or classes rejecting it and that the Plan otherwise meets the requirements for confirmation.

At the hearing on confirmation of the Plan, the Bankruptcy Court will hear any timely filed objections from a party in interest to confirmation of the Plan.

      1.6     Confirmation Hearing

**The Bankruptcy Court has set _____, 2009, at \_\_\_\_o'clock _____.m for a hearing on confirmation of the Debtors' Plan.**

### 1.7 Binding Effect of Plan

If the Court confirms the Plan, each creditor will be bound by the terms of and the treatment set forth in the Plan.

## II. DEFINITIONS

1. Defined Terms. In addition to any terms defined elsewhere in the Disclosure Statement or Plan the following terms have the indicated meanings:

Allowed Claim. A claim that (i) is liquidated and has been scheduled as undisputed, or (ii) for which a proof of claim has been filed that has not been objected to or that has been objected to but has been allowed by the Court.

Allowed Interest. An interest that (i) has been scheduled as undisputed, or (ii) for which a proof in interest has been filed that has not been objected to or that has been objected to but has been allowed by the Court.

Bankruptcy Code. Title 11 of the United States Code.

Bankruptcy Court. The United State Bankruptcy Court for the District of Arizona.

Confirmation Date. The date on which the Court enters the Confirmation Order.

Confirmation Order. The order of the Court confirming the Plan.

Debtors. Charles and Christa Crowell.

Distribution. The cash to be distributed under the Plan to the holder of Allowed Claims and Allowed Interests.

Disbursing Agent. The Debtor, or any other entity designated by the Debtor to act in such capacity.

Effective Date. The first business day following the date upon which the Confirmation Order has become final and non-appealable with no appeal then pending, except that the Debtor will have the right to treat this date as



having occurred under any circumstances which would moot any such appeal.

Insider.  Any person or entity defined as an insider in Section 101 of the Bankruptcy Code.

Plan.  The Debtors' Plan of Reorganization, together with any modifications thereto as may be filed by the proponent of the Plan.

Pro-Rata.  Proportionately so that the ratio of the amount of consideration distributed on account of an Allowed Claim in a particular class to the amount of consideration distributed on all Allowed Claims in the same class, is the same as the ratio of the amount of that Allowed Claim to all Allowed Claims in the same class.

Reorganized Debtor.  The Debtors following confirmation, as reorganized by this Plan.

2.    Undefined Terms.  A term used but not defined herein, but that is defined in the Bankruptcy Code, has the meaning given to that term in the Bankruptcy Code.

A term used but not defined herein, but that is defined in the Bankruptcy Code, has the meaning given to that term in the Bankruptcy Code.

III.    HISTORY AND EVENTS LEADING TO THE CHAPTER 11 FILING

3.1    Events Precipitating this Case.

Crowell founded Green Light Inc (GLI) in 2003 while serving on active duty as an intelligence officer for the US Army.  Crowell faced a medical discharge and intended to begin establishing a business that could support his family upon exiting the military. On his birthday, September 3 2004, Crowell was medically discharged in the rank of Captain.



Shortly thereafter, Crowell started to take notice of the local booming real estate market and decided to build his own house at 2977 Camino Las Palmeras. Crowell also began to invest in the local builders and joined the Southeastern Arizona Contractors Association. Here Crowell developed professional mentorships with local political figures and executives of construction and development companies. Crowell was appointed by his county supervisor and served on the Cochise County Board of Adjustments. Crowell served as vice chair and ultimately chairman until recently stepping down due to personal financial troubles. Crowell's prior mentoring from his county board of supervisors and county campaigns led him to understand that Cochise County was being destroyed by wildcatters (those who bypass the subdivision regulations by lot splitting). Crowell desired to preserve his community and built his Green Light Inc Corporation to do just that. Crowell intended GLI to be the county's main contributor to smart growth principles and energy efficient developments. Crowell pioneered the county's first "green community" with the University of Arizona and a former Cochise County P&Z member.

Between 2005 and 2006 Crowell's investments into his local builders and local developers earned him an average of $250,000 annually. In 2005 Crowell joint ventured with the local area's largest landscaping contractor, Southwest Desert Images, LLC in a land development company called Southwest Desert Development LLC (SDD), an Arizona limited liability company. Crowell placed two lots which later sold for an approximately $90K profit and agreed to purchase 2785 S Windsock (BK Estate) with

such proceeds in return for a 33% ownership in the surrounding 62 acres. This became the first subdivision development of SDD known as Rio Corte.

In 2006 SDD did not have the wherewithal to fully finance the Rio Corte subdivision project. Crowell sought A&D financing until he was introduced to Ken Schaub, mortgage broker and CEO of Schaub Financial Inc by a mutual broker. In Dec 2006 Crowell as Rio Corte LLC borrowed $1,097,000 from Rio Corte Lender LLC to purchase the outstanding 66% ownership in SDD and complete the development of a 22 lot community in accordance with the current Cochise County Subdivision Regulations. The Crowells and Green Light Inc proudly identified itself as an upcoming developer devoted to serving their community and her environment.

Schaub Financial Inc believed in the continued growth of Cochise County and motivated Green Light Inc and the Crowells to further expand their operations while Schaub Financial would fund new projects. GLI and the Crowells agreed and executed commitments to borrow almost $15MM for project funding from Schaub Financial.  GLI along with the Crowells placed assets and personal monies to provide intermediate financing based on promises of reimbursement. Schaub Financial Inc notified Crowell & GLI in October 2007 for shortages of funding and collapsed in April 2008 with only funding approximately 25% of the project development funds. The Crowells and GLI were never reimbursed for their expenses to contractors and quickly faced financial troubles.  The Crowells filed complaints of the ponzi lending scheme to its governing law enforcement agencies to include but not limited to; FBI, FTC, SEC, USAG, AZAG,

AZDFI, AZCC, Cochise County Attorney, Cochise County Sherriff. All agencies either ignored the claim and or made the claim non jurisdictional, AZDFI stating the "department's hand is weak."

Prior to the collapse of Schaub Financial, the Crowells and GLI partnered with the local Century 21 real estate agency. Green Light Inc housed its office in the Century 21 store front. At this time the Crowells marketed all of their real estate assets with Century 21. At a GLI corporate meeting, CJ Crowell introduced a plan to save his homes by renting to military soldiers on temporary orders (TDY) attending schools at the local military base. At the GLI corporate meeting Crowell called his new company "TDYRENTS.COM" and Century 21 was to be the agent and marketing vehicle earning 10% commission while contracted as broker on the same properties.

A few months after building this new business, Century 21 began to claim there were no interested parties in the Crowells homes. This lull in vacancy caused the Crowells and Green Light to close their office inside of Century 21. The Crowells were sending possible clients to Century 21 and could not understand how Century 21 claimed no calls. At this same time Century 21 broker began to demand higher commissions for TDY in excess of 20% and claimed there were other clients willing to pay such. Unbeknownst to the Crowells, Century 21 had started to contract other homeowners to rent their homes to TDY and the soldiers sent by the Crowells ended up staying in homes not related to the Crowells or their "TDYRENTS.COM" business. Century 21 continued to claim they could not get any interest in the Crowell properties even though such



properties were the only pictures on the website at the time. Century 21 suggested short selling the Crowell properties while telling the buyer, a TDY home investor, that as soon as the properties were purchased, Century 21 could fill the homes with TDY students. The Crowells became infuriated with this knowledge and severed their relationship with Century 21 canceling all of their contracts. Century 21 failed to pay the Crowells all of their rent funds owed and refused to return over $4,000 in office furnishings. Century 21 refused to return the website "TDYRENTS.COM" claiming ownership of the domain and refused to remove pictures of the desired properties of the Crowells from the website. Parties interested in the Crowell properties were told they were not available further undermining the Crowells capabilities to maintain finances. Today Century 21 still profits from the proceeds of "TDYRENTS.COM" leading to the expansion of a new office and a retail sign of the Crowell's company "TDYRENTS.COM."

The Crowells struggled to maintain their TDYRENTS.COM business without their website and started operating One Star LLC in June 2008. The Crowells sought the help of a "Feldman Law Center" who promised loan modifications while the Crowell properties slipped into delinquency. In October 2008, instead of turning over the rental funds to the mortgage note holders, the Crowells retained the services of The Feldman Law Center for approximately $16,000 to modify the loans of the five secured properties now in the bankruptcy estate (3804 Cabo Cope, 2977 Camino Las Palmeras, 3121 Camino Las Palmeras, 4413 Redwood Street, and 7852 South windsock). April 2008, Six months of promises from the Feldman Law Center produced no results. The

Crowells demanded documentation form Feldman Law and the mortgage companies and nothing could be produced but an authorization letter sent in by the Crowells. The Crowells pleaded with the mortgage companies and trustees and successfully postponed the trustee sales.

At this same time, the Crowells One Star LLC business also began to thrive running approximately $30,000 in transactions for April 2008 and negotiated making payments to the mortgage companies that would cease all foreclosure action. Without notice, Wells Fargo Merchant Services failed to deposit One Star transactions. Wells Fargo emptied all funds in the One Star checking account claiming they now need reserves. The Crowells penniless, filed for bankruptcy.

3.2     <u>Actions Taken by Debtor Post-Petition</u>.

After filing, the Crowells continue to maintain their One Star LLC business producing rental income. Once Wells Fargo Merchant Services learned of the filing, they terminated the Crowells Merchant account due to Mr. Crowell being the guarantor of the merchant account. This crippled the operations of One Star LLC by denying its ability to process government credit cards, 100% of income produced by One Star LLC and the Crowells. The Crowells have since negotiated with other similar TDY businesses to lease their properties and resell such leases to the Crowells in order to process payments. The Crowells have begun a new campaign for their TDY operations called "TDYME.COM".

Mr. Crowell continues to create relationships on the local military installation and sponsors incoming class parties and award events. Mr. Crowell continues to build

furniture and personally manages the cleaning, maintenance, advertising &marketing, accounts receivables & payables, and day to day requests and services to guests. Fort Huachuca is expected to increase its student population by 50% in the next 4 years to approximately 14,000 students enrolled per year. The fort is recipient of an $11 Billion program in a community of approximately 50,000 with 25,000 being soldiers. The Crowells recognize the current hotel accommodations crunch and believe their TDY business will continue to thrive.

   3.3  <u>Litigation</u>.

   The debtors are currently parties to certain litigation filed in Cochise County Superior Court CV 200801146 and removed by the defendants to the bankruptcy court Adv. Case No. 4:09-00743.  The debtors are parties to that litigation by virtue of a third party complaint filed by Apache Point 30 Lender, LLC, Rio Corte Lender, LLC, and Sierra Vista 41 Lender, LLC (the "Lending Entities").  The Lending Entities have also filed a complaint objecting to the discharge of their alleged claims against the debtors Adv. Case No. 4:09-ap-00823.  Each of the complaints similarly alleges that the debtors defrauded the Lending Entities in connection with certain loans made by the Lending Entities to certain companies in which the debtors own an interest (the "Borrowing Entities").  The Borrowing Entities have brought claims against the Lending Entities as well for breach of contract.   The debtors do not believe there is any basis to the Lending Entities' complaints and are optimistic they will successfully prevail in the litigation.

However, the litigation in both cases is in its infancy. A copy of the complaint in Adv. Case No: 4:09-ap-00823 is attached hereto as Exhibit "B".

The debtors are also named as defendants in an adversary proceeding brought by Webster Bank objecting to the discharge of Webster Bank's claim. The complaint alleges, among other things that the debtors misrepresented their financial condition in connection with a loan received from Webster Bank. The debtors adamantly deny the allegations and are confident they will prevail in that case. A copy of the complaint in Adv. No. 4:09-ap-00912 is attached hereto as Exhibit "C".

Various secured creditors have filed motions for relief from the automatic stay. None of those motions have been granted.

3.4    Retention of Professionals.

The debtor has applied to the Court for approval of the employment of the following professionals:

McGuire Gardner, PLLC (the "Firm") has applied to act as the attorney for the estate. An order approving the Firm was entered by the Court on August 21, 2009.

FINANCIAL INFORMATION

4.1    Assets.

The Debtors have assets consisting of real and personal property. The debtors property is listed in Schedules A and B of its Schedules a copy of which is attached hereto as Exhibit "D". A copy of certain appraisals upon which the debtors rely to establish the amount of various secured claims are attached hereto as Exhibit "E".

4.2     <u>Claims</u>.

Claims against the debtors are set forth in Schedules D, E, and F to the Debtors' Schedules a copy of which is attached as Exhibit "F".

**FOR PURPOSES OF PLAN COMPUTATION, ALL OBLIGATIONS OF THE VARIOUS CREDITORS LISTED IN THE SCHEDULES IN THIS DISCLOSURE STATEMENT AND PLAN SHOULD BE CONSIDERED AS ESTIMATES ONLY AND ALL CLAIMS ARE CONSIDERED DISPUTED AS TO THE AMOUNT UNLESS SUPPORTED BY A TIMELY FILED PROOF OF CLAIM (AND IF OBJECTION THERETO IS FILED BY DEBTOR FOLLOWING RESOLUTION BY THE BANKRUPTCY COURT AS TO AMOUNT OF THE CLAIM), OR IF THE CLAIM HAS BEEN SCHEDULED AS UNDISPUTED, FIXED AND LIQUIDATED.  ALL CREDITORS' CLAIMS NOT SUPPORTED BY TIMELY FILED PROOF OF CLAIM OR SCHEDULED AS UNDISPUTED, FIXED AND LIQUIDATED, MAY BE EXCLUDED FROM PLAN COMPUTATIONS AND DISTRIBUTIONS UNDER THE PLAN OR AT DEBTORS' OPTION, INCLUDED AT THE AMOUNTS OR VALUES LISTED HEREIN.**

V.     <u>SUMMARY OF PLAN</u>

The following description of the plan is for informational purposes only and does not purport to change or supersede any of the specific contractual language of the plan. THE PLAN IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY

BETWEEN THE CONTENTS OF THE PLAN AND THE CONTENTS OF THIS
DISCLOSURE STATEMENT.

     5.1    <u>Classification and Treatment of Claims</u>

The plan divides Claims against the Debtor into classes which the Debtor believes
are in compliance with the Bankruptcy Code. Their classification and treatment are as
follows:

     5.1.1   <u>Class 1: Priority Claims</u>. Class 1 claims will consist of all claims
which are allowed claims pursuant to Bankruptcy Code § 507(a)(1), including, without
limitation, the Allowed Claims of the Debtors' professionals, any other professionals
approved by the Court, any quarterly fees payable to the United States Trustee, and other
claims of creditors holding Administrative Claims, including taxes.

     5.1.1.1<u>Class 1a Priority Claim of the IRS</u> Class 1a consists of the allowed
unsecured priority claim of the Internal Revenue Service.

     5.1.2   <u>Class 2: Secured Claim</u>. Class 2 consists of the Allowed
Secured Claim of Tombstone Federal Credit Union, secured by an interest in a 2008
Chevrolet Silverado.

     5.1.3   <u>Class 3: Secured Claim</u>. Class 3 consists of the Allowed
Secured Claim of Webster Bank secured by an interest in the real property located at
3121 Camino Las Palmeras, Sierra Vista, Arizona.



5.1.4 <u>Class 4 Secured Claim</u>  Class 4 consists of the Allowed Secured Claim of Decision One Mortgage Company, secured by an interest in the real property located at 7852 South Windsock Road, Hereford, Arizona.

5.1.5. <u>Class 5 Secured Claim</u>  Class 5 consists of the Allowed Secured Claim of Litton Loan Servicing, secured by an interest in the real property located at 3804 Cabo Cope Drive, Sierra Vista, Arizona.

5.1.6. <u>Class 6 Secured Claim</u>. Class 6 consists of the Allowed Secured Claim of Saxson Mortgage, secured by an interest in the real property located at 4413 Redwood Street, Sierra Vista, Arizona.

5.1.6.1 <u>Class 6A Secured Claim</u>.  Class 6A consists of the Allowed Secured Claim of Litton Loan Servicing secured by an interest in the real property located at 4413 Redwood Street, Sierra Vista, Arizona.

5.1.7 <u>Class 7 Secured Claim</u>  Class 7 consists of the Allowed Secured Claim of J & J and A & A, LLC, secured by an interest in the real property located at 2977 Camino Las Palmeras, Sierra Vista, Arizona.

5.1.8 <u>Class 8 Secured Claim</u>  Class 8 consists of the Allowed Secured Claim of Cochise County secured by an interest in various parcels of the debtors' real property.

5.1.9 <u>Class 9: Unsecured Lender Claims</u>.  Class 9 will consist of the Unsecured Lender Claims filed by Apache Pointe Lenders, LLC,

5.1.10 <u>Class 10: General Unsecured Claims</u> Class 10 will consist of all other general unsecured claims.

The following represents creditors who have filed proofs of claim with the Court, as well as the undersecured portion of certain creditors holding liens on the debtors' real property:

| Name of Creditor | Amount of Proof of Claim |
|---|---|
| AAFES | $4,733.46 |
| AMEX | $9,625.74 |
| AMEX | $11,056.11 |
| Associated Design Professionals | $10,355.25 |
| Busy D. Pumping | $849.20 |
| Capital One Bank | $3,715.61 |
| Charlotte Startt | $18,000.00 |
| Chase Bank | $12,175.05 |
| Chase Bank | $6,991.94 |
| Discover Bank | $6,625.88 |
| First Equity Card | $4,119.25 |
| HSBC | $1,039.60 |
| HSBC | $1,063.04 |
| Internal Revenue Service | $15,549.41 |
| John Deere | $19,323.54 |
| John Deere | $5,350.95 |
| Nissan Infinity | $15,439.96 |
| Pentagon Federal Credit Union | $10,944.98 |



| | |
|---|---|
| Southwest Gas Corporation | $472.82 |
| Undersecured Creditors | Amount of Unsecured Claim |
| Litton Loan Servicing | $44,045.94 |
| Southwest Desert Imaging | $299,785.95 |
| Webster Bank | $195,000 |
| Decision One Mortgage | $50,000 |
| America's Servicing | $90,000.00 |
| Select Portfolio Servicing | $65,000.00 |
| J & J and A & A, LLC | $1,385,000* |

\* The unsecured claim of J & J and A & A LLC will in all likelihood be reduced in light of the fact that it asserts a lien on a twenty-one acre parcel of property owned by Ramsey Reserve, LLC, which is not property of the estate. At this point, the debtors are unaware of the current market value of that parcel.

Classes 2 through 10 are impaired.

5.2 <u>Operation of Plan</u>.

Unless otherwise stated, the Debtor intends to restructure the loan obligations on various rental properties and to continue to rent those properties to generate income which will be used to satisfy all secured claims in full and to pay all of the debtors' disposable income over a six year period of time in compliance with 11 U.S.C. § 1129(a)(15).

A. <u>Treatment of Class 1</u>

Administrative claims pursuant to 11 U.S.C. § 503(b) including but not limited to pre-confirmation attorney's fees approved by the Court, U.S. Trustee expense, expenses of the U.S. Bankruptcy Clerk, and pre-confirmation administrative taxes, if any, shall be



paid in full upon the Effective Date unless otherwise agreed in writing with said creditor. The U.S. Trustee fees shall be paid in full as of the Effective Date of the Plan, and shall continue to be paid until the case is closed. The debtors owe approximately $32,000 in attorney's fees and debtors' counsel has approximately $8,000 in trust. The debtors estimate they will have another $20,000 in fees through confirmation due to anticipated opposition from various creditors. It is anticipated that the debtors will pay approximately $10,000 towards administrative expenses at the time of plan confirmation and the remaining fees from future rental income for the first twelve months of the plan.

Treatment of Class 1A

The debtors shall pay the Class 10 priority claim the sum of $5,696.82 in forty-eight equal installments of $118.68.

B        Treatment of Class 2

The debtors have entered into a stipulation with the Class 2 Claim holder Tombstone Federal Credit Union, which stipulation has been approved by the Court. The Stipulation provides that the Class 2 Claim Holder with an Allowed Secured Claim in the amount of $36,215.00. This amount shall be repaid with 5.5% interest over a 72 month period payable at $591.68 per month beginning July 5, 2009 with subsequent payments due on the 5th of each month thereafter until paid in full.

C.  Treatment of Class 3

Beginning on the 1st of the month following the Effective Date, the debtors shall pay the Class 3 Claim Holder Webster Bank, the sum of $375,000 with interest at the fixed rate of 5.5% per annum over 30 years with a balloon payment of all principal and interest coming due six years after the Effective date. All other terms and conditions of the parties' loan documents shall remain the same.

D.  Treatment of Class 4

The debtors shall pay the Class 4 Claim Holder, Decision One Mortgage, the net proceeds from the sale of the property securing its claim together with all cash collateral

attributable to the rental of the property securing the Class 4 Claim existing on the Effective Date or the date the property securing the Class 4 claim is sold, whichever is earlier.

E.  Treatment of Class 5

Beginning on the 1st of the month following the Effective Date, the debtors shall pay the Class 5 Claim Holder, Litton Loan Servicing, the sum of $265,000 with interest at the fixed rate of 5.5% per annum over 30 years with a balloon payment of all principal and interest coming due six years after the Effective Date.  All other terms and conditions of the parties' loan documents shall remain the same.

F.  Treatment of Class 6

Beginning on the 1st of the month following the Effective Date, the debtors shall pay the Class 6 claim Holder, Saxson Mortgage, the sum of $165,000 with interest at the fixed rate of 5.5% per annum over 30 years with a balloon payment of all principal and interest coming due six years after the Effective Date.  All other terms and conditions of the parties' loan documents shall remain the same.

G.  Treatment of Class 6A

Beginning on the 1st of the month following the Effective Date, the debtors shall pay the Class 6 claim Holder, Litton Loan Servicing, the sum of $30,000 with interest at the fixed rate of 5.5% per annum over 30 years with a balloon payment of all principal and interest coming due six years after the Effective Date.  All other terms and conditions of the parties' loan documents shall remain the same.

H. Treatment of Class 7.

Beginning on the 1st of the month following the Effective Date, the debtors shall pay the Class 7 claim Holder, J & J, and A & A, LLC the sum of $325,000 with interest at the fixed rate of 5.5% per annum over 30 years with a balloon payment of all principal and interest coming due six years after the Effective Date.  The debtors shall further pay to the Class 7 Claim Holder all cash collateral attributable to the rental of the property

securing the Class 7 Claim existing on the Effective Date. All other terms and conditions of the parties' loan documents shall remain the same.

I. Treatment of Class 8.

The debtors shall pay the Class 8 claim Holder, Cochise County, the principal sum of $9,526.55 with interest at the rate of 16% per annum in sixty equal installments of $231.67.

J. Treatment of Class 9. The debtors do not believe that the Class 9 Claimants, the Lending Entities, hold a valid claim against the estate. However, the debtors will set aside each month the pro rata amount (as established under paragraph J) that the Class 9 Claimants would be entitled to receive in the event the Class 9 Claimants establish the validity of their claim.

K. Treatment of Class 10

Beginning twelve months from the Effective Date, the Debtors shall pay the amount of $2,000.00per month over a 60 month period to the Class 10 claims in accordance with the requirements of 11 U.S.C. § 1129(a)(15). The debtors project that their disposable income will be $2,000.00 each month. A summary of the basis for the debtors' calculation of projected disposable income is attached hereto as Exhibit "G".

The debtors will also pay to the Class 10 claim holders the net proceeds (after payment of attorney's fees and costs) recovered, if any, from the litigation with the Lending Entities.

L. The holder of any claim to which an objection has been made prior to or on the date on which the first payment to the holder of such a claim is made, shall not be entitled to receive any distribution otherwise attributable to that claim until the objection has been resolved by order of the Court. Any distribution which would otherwise accrue to the benefit of the holder of an Allowed Claim prior to resolution of an objection shall be held by the Debtor in a segregated account and upon resolution of the objection either paid to the claimholder or returned to the estate, as appropriate, in



light of the Court's resolution of the objection. In the event a claim is reduced voluntarily by the claimholder or by ruling of the Court following objection by the Debtor or any other party in interest, the Debtor may at its option continue to make payments in the monthly amounts specified in this Disclosure Statement and the Plan of Reorganization until the reduced claimholder has received all amounts to which it is entitled, or alternatively, reduce the monthly amount payable on behalf of the reduced claim (and all claims of the same class) so that the claims are paid within the time specified in the Disclosure Statement and Plan of Reorganization. This option to decrease the monthly payment but pay for the full term specified in the Plan or maintain the monthly payment and reduce the term over which such payments must be paid, shall be within in the sole discretion of the Debtor and the exercise of his reasonable business judgment.

M.     At any time during the duration of this Plan, the Debtor reserves the right to sell all or any part of his property interests provided the remaining assets and/or the value received upon sale permits the full distributions required by the Plan. In such event, the Reorganized Debtor will retain any surplus funds following distribution in full to eligible classes.

N.     All undisputed taxes generated by any step of the operation of this Plan, or accruing during the operation of this Plan, will be considered administrative expenses to be satisfied as they accrue.

**THE DEBTOR BELIEVES THAT THE PLAN DESCRIBED HEREIN PROVIDES THE GREATEST AND EARLIEST POSSIBLE RECOVERIES TO CREDITORS. THE DEBTOR THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF EACH AND EVERY CLASS OF CREDITOR AND INTEREST HOLDER, AND RECOMMENDS THAT EACH CLASS VOTE TO ACCEPT THE PLAN.**

VI.     IMPLEMENTATION OF THE PLAN

6.1     _Projection of Operation_.  A projection of income and expenses upon which this Plan is based is appended hereto in Exhibit "H"  Exhibit "H" is a projection of the expected rental income for 2011 through 2015.  The economic assumptions underlying this Plan are set forth below.

6.2     _Assumptions_.  In addition to the economic assumptions set forth in the projections attached as Exhibits to the Disclosure Statements, there are a number of other assumptions upon which this Plan is based:

A.      It is assumed that the Debtors have, or will have, sufficient funds on hand on the Effective Date of the Plan to pay administrative expenses as reflected herein and retain an initial capital reserve so that all revenues projected may be used to make distributions to creditors.

B.      It is assumed that the debtors will be able to achieve its target revenues based upon a continued occupancy of the rental properties.

6.3     _Risk Factors_.  Just as in any business, the business in which the Ministry is engaged involved certain risks, including the following:

A.  Competition.  There can be no assurance that new competition will not enter the market, with the effect of decreasing the profit margins and/or amount of new business.

B.  Future Default.  The Debtors are obligated by the terms of the Plan to pay certain payments to the Class 2 through 8 secured creditors.    Should the Debtors fail to make those payments when due, the secured creditor would have access to state court proceedings or other non-judicial remedies to enforce its security interest.  Such default and subsequent loss of assets of the estate could have a significant adverse interest on the Debtors' ability to fund the other distributions called for in the Plan.

## VII  LIQUIDATION ANALYSIS

In order to arrive at a judgment on whether or not to vote for or against the Plan, a creditor or other party in interest needs to have an understanding of the consequences that would be realized if the Debtors' estate were liquidated pursuant to Chapter 7 of the Bankruptcy Code.

In the instant case, it is anticipated if the Debtors' estate were liquidated and the assets sold pursuant to a Chapter 7 liquidation, the sale of the real property would be accomplished at prices less than the fair market value than if sold in a non-liquidation setting. Even assuming that the real property could be sold at its current value, the liquidation analysis demonstrates that there is no equity in any of the real property available to pay claims to general unsecured creditors.

The debtors have no significant non-exempt assets other than their interest in One Star, LLC, and a potential recovery through their other LLCs against the Lending Entities. The liquidation analysis does not set forth an amount for this potential asset. However, the debtors' plan does provide that any net recovery from that litigation would be paid to general unsecured creditors.

Sample Chapter 7 Scenario

Available Assets in Chapter 7

Total Assets Available for distribution to unsecured
Creditors in Chapter 7 Liquidation
    Interest in One Star LLC                 $12,500.00

| Comparison of Percentage Recovery | Chapter 7 | Chapter 11 |
|---|---|---|
| Class 1  Administrative Fees | | |
| $ 3,000.00   (Chapter 7 Trustee Fees) | 100% | n/a |
| $25,000 (Attorney's Fees) | 40% | 100% |

|                    | Chapter 7 | Chapter 11 |
| ------------------ | --------- | ---------- |

Class 2 - 8

The debtors' plan provides for payment of all Allowed Secured Claims in amount equal to or exceeding what the claimant would receive in chapter 7 assuming that the property would sell at or below its appraised value, after deducting for costs of sale.

|                    | Chapter 7 | Chapter 11 |
| ------------------ | --------- | ---------- |
| Class 9 (disputed) | 0%        | 0%         |
| Class 10           | 0%        | 6%         |

The liquidation analysis assumes Chapter 7 trustee's fees based upon the fees recoverable under 11 U.S.C. § 326. The liquidation analysis further assumes chapter 11 attorney's fees incurred throughout the case would be paid from the chapter 7 estate. Finally, the claims for each creditor are estimates provided by the debtor. Certain of the secured and unsecured claims may be disputed. The debtors' have approximately $12,500 (none of which would be available to general unsecured creditors in the event of liquidation in chapter 7) in non-exempt property, while the plan proposes to pay general unsecured creditors approximately $120,000.00.

VIII.   COMPLIANCE WITH BANKRUPTCY CODE.

In order to confirm the Plan, the Bankruptcy Court must make a series of determinations concerning the Plan, including those set forth, infra. The Debtor believes that each of these conditions has been met and will seek rulings of the Bankruptcy Court to this effect at the confirmation hearing.

In addition, the Bankruptcy Code also requires that the Plan be accepted by requisite votes of holders of claims and interest. If any member of an impaired class does

not accept the Plan, the Bankruptcy Court must find that confirmation of the Plan is in the "best Interests" of such entities.

8.1    <u>Classification of Claims and Interest</u>.  The Bankruptcy Code requires that a plan of reorganization place each creditor's claim and each holder of an interest in a class with other claims or interest that are "substantially similar."  The Debtor believes that the Plan's classification system meets the Bankruptcy Code standard.

8.2    <u>Section 1111(b) Election</u>.  Section 1111(b) of the Bankruptcy Code provides that as a general rule, a secured claim is to be accorded a treatment in the Chapter 11 Plan that is the same as would be received if it were a recourse claim, regardless of whether or not the claim is non-recourse by agreement or applicable law.  Section 1111 also provides an opportunity for a partially secured creditor whose claim is treated by the proposed Plan of Reorganization as partially secured and partially unsecured to acquiesce in such bifurcation of their claim or, alternatively, to elect to treat the claim as fully secured.  In this case, Debtors have not treated any creditor as partially secured.

8.3    <u>Technical Requirements</u>.  To be confirmed, the contents of a plan must comply with the technical requirements of Chapter 11 of the Bankruptcy Code, which the Debtor believes to have been done.

8.4    <u>Good Faith</u>.  To be confirmed the Bankruptcy Court must find that the Debtor has proposed the Plan in good faith.  In the instant case that requirement is met, since the Plan contemplates a bona fide reorganization in which the creditors will be paid

an amount on behalf of their claims that is greater than would be received through liquidation or conversion to a Chapter 7 proceeding.

8.5 <u>Disclosure</u>. The Bankruptcy Court must find that the Debtors' disclosures concerning the Plan have been adequate and have included information concerning all payments made or promised in connection with the Plan and the bankruptcy case, as well as the identity, affiliations and compensation to be paid to all officers, directors and other insiders. The Debtor believes this requirement to have been met by the Disclosure Statement.

8.6 <u>Feasibility</u>. The Plan may not be confirmed if the Bankruptcy Court finds that confirmation is likely to be followed by the liquidation of the Reorganized Debtor or the need for further financial reorganization. The Debtor believes that it will be able to perform its obligations under the Plan and continue to operate its business without further reorganization, all as set forth herein.

8.7 <u>Best Interests</u>. Notwithstanding acceptance of the Plan by creditors and interest holders impaired under the Plan, if a claimant or interest holder does not accept the Plan, then the Bankruptcy Court must independently determine that the Plan is in the best interests of that claimant's or interest holder's class. To meet this test, the Bankruptcy Court must determine that each claim or interest in the impaired class will receive under the Plan, as of the Effective Date, property of a value at least equal to the value that each such holder would receive if the Debtor were liquidated under Chapter 7

of the Bankruptcy Code. A liquidation analysis is contained in Section VII of this Plan, from which it can be seen that the foregoing condition is met.

IX.     TAX CONSEQUENCES OF PLAN

In 1978, a massive revision of the bankruptcy laws was enacted as the Bankruptcy Code now in effect. In turn, the impact of the Bankruptcy Code on the existing tax laws led to the enactment of the Bankruptcy Tax Act of 1980, P.L. 96-589, 94 Stat. 3389 (1980). this Act made a number of significant changes in the law, relating inter alia, to how the bankruptcy estate is taxed, whether the occurrence of the bankruptcy will interrupt the Debtors' taxable year, whether income and deductions belong to the Debtor or the estate, and whether individual losses are available to the estate.

**CLAIMANTS ARE ADVISED TO CONSULT WITH THEIR TAX ADVISORS CONCERNING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED IN THIS PLAN, INCLUDING STATE AND LOCAL TAX CONSEQUENCES.**

X.     VOTING/CONFIRMATION/ALTERNATIVES

10.1     Voting. A creditor may vote either to accept the Plan or to reject the Plan. Only the votes of impaired classes will be counted in connection with confirmation of the Plan, since classes of claims and interests which are not impaired are deemed to have accepted the Plan. In determining acceptance of the Plan, votes will be counted only if submitted by a party with an Allowed claim or an Allowed Interest, and the ballot for voting on the Plan does not constitute a proof of claim for this purpose. A claim to which

an objection has been filed is not an Allowed Claim unless and until the Bankruptcy Court has ruled on the objection, and although holders of disputed claims will receive ballots, these votes will not be counted unless the Bankruptcy Court temporarily allows such claim for purposes of voting on the Plan.

10.2    Confirmation.  In order for the Plan to be approved, it must either (i) be accepted by at least two-third in amount and more than one-half in number of the creditors of each impaired class, or (ii) be approved by the Court as being in the best interest of all parties in spite of failure to receive the required votes of creditors in any particular class (i.e. "cram-down").

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of two-thirds in dollar amount and a majority in number of claims of that class, counting only those members of the class who actually vote.  The Bankruptcy Code defines acceptance of a plan by a class of interests (equity securities) as acceptance by two-thirds of the number of shares, counting only those shares actually voted.

Classes of claims and interests that are unimpaired under the Plan are conclusively deemed to have accepted the Plan.  A class of creditors or interest holders is unimpaired if the Plan (i) does not alter the legal, equitable or contractual rights between the Debtor and the creditor or interest holder (with the exception of reinstating the claim by curing any defaults), or (ii) pays the claimant the full amount of the claim or interest by cash payment on the Effective Date.  Classes of claim and interests that receive no distribution

under the Plan are deemed to have rejected the Plan. Consequently, ballots are being sent only to those classes which are impaired but are to receive a distribution under the Plan.

The Plan may be confirmed by the Bankruptcy court even if it is not accepted by all classes of impaired claim, as long as at least one impaired class of claims has accepted.

10.3     Alternative To Confirmation.  In the event this Plan is not confirmed, the Chapter 11 proceeding can be (i) continued for the submission of other plans, (ii) converted to Chapter 7, or (iii) dismissed.  In the event the Plan is not confirmed through acceptance of the claimholders, it is the Debtors' intention to seek confirmation through cram-down.

## XI..     INFORMATION/REPRESENTATIONS

11.1     Source of Information.  Unless otherwise stated, all of the information contained herein is based on information supplied by the Debtor or its agents, and no representations concerning the Debtor are authorized by the Debtor other than as set forth in this Disclosure Statement.

11.2     Conflicts.  To the extent any information set forth in this Disclosure Statement conflicts with any information set forth in the Debtors' schedules or statement of financial affairs, this Disclosure Statement will govern and will, to the extent necessary, constitute an amendment to the affected schedules or statement of financial affairs.



11.3   <u>Unauthorized Representations</u>.  Any representations or inducements made to secure acceptance other than as contained in this Disclosure Statement should not be relied upon arriving at a decision, and such representations and inducements should be reported to counsel for Debtor, who, in turn, shall deliver such information to the Court for appropriate action.

11.4   <u>Disclaimer</u>.

**NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH HEREIN.  YOU SHOULD NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS TO ACCEPT THE PLAN OTHER THAN THOSE CONTAINED HEREIN.**

**AN ACCOUNTANT HAS NOT REVIEWED OR APPROVED THE INFORMATION CONTAINED HEREIN.  MUCH OF THE INFORMATION CONTAINED HEREIN WAS DERIVED FROM THE DEBTOR OR THE DEBTORS' RECORDS AND HAS NOT BEEN VERIFIED FROM INDEPENDENT SOURCES.  THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY ALTHOUGH ALL SUCH INFORMATION IS ACCURATE TO THE DEBTORS' BEST KNOWLEDGE, INFORMATION, AND BELIEF.**

**THE COURT HAS NOT VERIFIED THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.  THE COURT'S APPROVAL OF THE**

**DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE COURT ENDORSES OR APPROVES THE PLAN, BUT ONLY THAT IF THE INFORMATION IS ACCURATE, IT IS SUFFICIENT TO PROVIDE AN ADEQUATE BASIS FOR CREDITORS AND INTEREST HOLDERS TO MAKE INFORMED DECISIONS WHETHER TO APPROVE OR REJECT THE PLAN.**

Dated this 11th day of September, 2009

**MCGUIRE GARDNER, PLLC**

/s/ Pernell W. McGuire
Pernell W. McGuire

/s/ Charles Crowell
Charles Crowell

/s/ Christa Crowell
Christa Crowell